Roger L. COMEAU; David L. Comeau; Charles G. Comeau; Rooks County Savings Association; and Federal Savings and Loan Insurance Corporation (as successor in interest to Rooks County Savings Association); and Rupp Financial Corporation, Plaintiffs,

v.

Terry RUPP; C.F. Rupp; Farmers National Bank; Alexander Grant & Co.; Grant Thornton (formerly Alexander Grant & Co., a partnership); and Fox & Company, a partnership, Defendants.

Civ. A. No. 86–1531–MLB.

United States District Court,
D. Kansas.

Dec. 29, 1992.

A.J. Schwartz, Donald E. Schrag, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Roger L. Comeau, David L. Comeau, Charles G. Comeau, Rupp Financial Corp.

Byron J. Beck, Mary L. Barrier, Theresa L.F. Levings, Zoe Ann K. Holmes, Morrison & Hecker, Kansas City, MO, John C. Nettels, Jr., Morrison & Hecker, Wichita, KS, for F.D.I.C.

Robert F. Lytle, Patrick D. Gaston, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, KS, for Terry Rupp, C.F. Rupp.

Robert J. Roth, William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, KS, Don C. Staab, Hays, KS, for Farmers Nat. Bank.

Ron C. Campbell, John T. Conlee, Fleeson, Gooing, Coulson & Kitch, Wichita, KS, Theodore A. Livingston, Jr., Mayer, Brown & Platt, Chicago, IL, for defendants Grant Thornton and Fox & Co.

Roger L. Bainbridge, Office of Thrift Supervision, Shawnee Mission, KS, James R. Bloss, Office of Thrift Supervision, Atlanta, GA, for Office of Thrift Supervision.

Robert C. Brown, Smith, Shay, Farmer & Wetta, Wichita, KS, for Jack Curtis, Bryan Ronck.

Jana D. Abbott, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for A.J. Schwart.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This matter is before the court on the motion of Defendants Grant Thornton ("Grant") and Fox & Company ("Fox") (collectively, "the Accountants") for reconsideration; the Accountants' motion in limine to exclude evidence on damages (Doc. 1012); and the Accountants' motion in limine to exclude evidence of prejudgment interest. The facts of this case have already been discussed, 810 F.Supp. 1127 (D.Kan.1992), and will not be repeated.

### I. *Motion for Reconsideration*

The standards governing motions to reconsider are well established. A motion

to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of due diligence. *Anderson v. United Auto Workers*, 738 F.Supp. 441, 442 (D.Kan.1990); *Taliaferro v. City of Kansas City*, 128 F.R.D. 675, 677 (D.Kan. 1989). "[R]evisiting the issues already addressed 'is not the purpose of a motion to reconsider,' and 'advanc[ing] new arguments or supporting facts which were otherwise available for presentation when the original summary judgment motion was briefed' is likewise inappropriate." *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992).

The Accountants ask the court to reconsider its ruling of October 29, 1992, in which the court denied the Accountants' motion for summary judgment against plaintiff Federal Deposit Insurance Corporation ("FDIC"). In denying the motion, the court followed the rationale and rule announced in *FDIC v. O'Melveny & Meyers*, 969 F.2d 744 (9th Cir.1992), where the court, under federal common law, refused to impute to the FDIC the wrongful actions and knowledge of the former officers and directors of a failed savings and loan association.

The Accountants argue that they "never had an opportunity to brief the 'considerations of federal common law'" underlying the decision of this court and *O'Melveny.* The court finds otherwise. In its October 29 Order, the court adopted the rule of *O'Melveny*—a case of which both parties were aware and which both parties briefed.[1]

■ Nor is the court persuaded that *O'Melveny* is distinguishable in any legally significant sense. The Accountants argue that *O'Melveny* only precluded the defendant from asserting estoppel against the FDIC. Thus, according to the Accountants, *O'Melveny* is limited to "equitable defenses" good against the bank, but not available against the FDIC. *See* 969 F.2d at 752. This argument, however, would allow a defendant to defeat the sound rationale of *O'Melveny* through the facile effort of artful pleading. In *O'Melveny,* the defendant argued that the wrongful conduct of former bank insiders should be imputed to the FDIC in order to "estop" the FDIC from maintaining suit against negligent third-parties. The Accountants herein urge precisely the same result that is based in equity—but have merely omitted any reference to "estoppel." Here again, the Accountants attempt to elevate form over substance.[2]

■ The Accountants contend that in the absence of congressional intent, federal courts have no authority to "override fundamental legal precepts" in FDIC litigation. But as the Accountants themselves must concede, federal common law ultimately governs the rights of the FDIC, *see FDIC v. Bank of Boulder*, 911 F.2d 1466, 1474–77 (10th Cir.1990) (en banc), *Downriver Community Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754, 760 (10th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). And if a body of federal common law exists apart from state common law, it should come as no surprise that courts consider matters of policy—which have always informed the common law. Indeed, state common law itself recognizes that "there may be special reasons of policy in particular cases which will lead to the imputation

1. The parties briefed the significance of *O'Melveny* through an exchange of "letter briefs," a practice that presents a problem exemplified by this case: the briefing is not contained in the record. The parties shall henceforth present all legal argument in the form of legal memoranda filed with the clerk.

2. In any event, the true nature of the Accountants' state law defense herein is estoppel—regardless of the appellation chosen by the Accountants. Under Kansas law, a corporation-principal is estopped from denying the actions of its agent taken within the scope of the agency, *see, e.g., Dearborn Motors Credit Corp. v. Neel,* 184 Kan. 437, 447, 337 P.2d 992 (1959), and a receiver of the corporation will likewise be subject to the same rights, defenses, and equities that were available to and against the insolvent corporation. *See Cates v. Musgrove Petroleum Corp.,* 190 Kan. 609, 611, 376 P.2d 819, 821 (1962); *Maxl Sales Co. v. Critiques, Inc.,* 796 F.2d 1293, 1297 n. 2 (10th Cir.1986).

of [a third party's] negligence to a defendant, but not to a plaintiff" against whom the defense of contributory negligence is asserted. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 74, at 529 (5th ed. 1984).

The Accountants also support their argument with the recent case of *FDIC v. Clark*, 978 F.2d 1541, 1549 (10th Cir.1992), which relied on *O'Melveny* to prevent defendant attorneys from imputing the wrongful conduct of former bank officers to the FDIC. The Accountants contend that the *Clark* court allowed the defense of imputed contributory negligence against the FDIC (although the jury rejected it) and did not rely on federal common law to preclude the defense. Although this contention is correct as far as it goes, the court is unable to read so much into judicial silence on a point of law. In that case, the jury was permitted to reject the defense of imputed contributory negligence on state law grounds, and it was thus unnecessary for the *Clark* court to address further considerations. Nor is there any indication that the FDIC pressed such an argument in that case. If anything, the court reads *Clark*'s favorable references to *O'Melveny* as support for its October 29 ruling.

Finally, the Accountants argue that the court failed to address their argument that the imputed knowledge (as distinct from the conduct) of the Rupps and the Comeaus defeats the FDIC's proof of causation. To the contrary, the court addressed this argument in the causation section of its order (I.A.2.), finding that genuine issues of fact preclude a summary finding "as to whether the RCSA Board *as a whole* relied upon the audits,...." (October 29 Order 810 F.Supp. at 1144; emphasis added). For purposes of either contributory negligence *or* causation, the court will impute neither "knowledge" nor "conduct" of former RCSA officers *to the RCSA*.

■ To clarify its earlier order, the court believes that knowledge chargeable *to former officers and directors of RCSA* (as opposed to RCSA) is relevant to the proof of causation. Because legal causation includes the concept of intervening, su-

perseding causes, *see, e.g., Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585, syl. ¶ 6 (1982), the Accountants may attempt to establish that certain knowledge must be imputed to other actors, whose breach of duty was a superseding cause of the FDIC's injuries. *See George v. Breising*, 206 Kan. 221, 227, 477 P.2d 983 (1970) ("If the original actor should have reasonably foreseen and anticipated the intervening act causing injury in the light of the attendant circumstances, his act of negligence would be a proximate cause of the injury."). Because critical facts are in dispute, however, the issue of superseding causes— which includes the intervening negligence of third parties—will also be a matter for the jury to determine. *See Prince v. Leesona Corp.*, 720 F.2d 1166, 1169 (10th Cir. 1983); *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043, 1047 (1989).

## II. *Lack of Proof as to Damages*

The court has allowed the Accountants to supplement their summary judgment motion with briefs addressing a dispositive matter raised in the pretrial order. According to the Accountants, the FDIC has no evidence that the Accountants' alleged negligence caused any of the FDIC's claimed damages.

■ The FDIC claims damages for losses sustained by RCSA on 19 specific participation loans that RCSA purchased from the Halle Mortgage Company. All of these loans were made after Fox conducted its 1984 audit. Only two of the loans were made after the 1985 audit by Grant. The FDIC alleges that properly prepared audits would have included, *inter alia*, a recommendation of substantial loan loss reserves. The FDIC's theory of causation is that the RCSA Board, if properly warned of the precarious financial state of RCSA as of August 1984, would have ceased purchasing additional Halle loans, and thus would have incurred no losses on these loans.

The Accountants argue that plaintiff must prove both: (1) "transaction causation," *i.e.*, that the Accountants made representations that specifically "induced"

RCSA to purchase additional Halle loans after 1984; and (2) "loss causation," *i.e.,* that the Accountants caused the loans to suffer losses after they were purchased.

 The court rejects both of the causation elements proposed by the Accountants. It is true that claims of *fraud* require some element of detrimental reliance by the plaintiff (or conversely, inducement by the defendant) involving specific misrepresentations. *See, e.g., Whitten v. Farmland Indus., Inc.,* 759 F.Supp. 1522, 1542 (D.Kan.1991) (citing cases). The Accountants also correctly quote the rule that " 'in a damage action by a purchaser for *fraud* inducing the purchase, the measure of damages is the difference between the actual value of the property at the time of the sale and the value it would have had if the representations had been true.' " *K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1159 (10th Cir.1985) (emphasis added; quoting *Fox v. Wilson,* 211 Kan. 563, 507 P.2d 252, 267 (1973)).

 These rules governing claims of fraud, however, have little relevance to this action, wherein the FDIC alleges claims of negligence and recklessness against the Accountants. As the FDIC notes, causation in a claim of professional malpractice is determined according to the same principles of proximate cause governing any negligence action. *See Sharples v. Roberts,* 249 Kan. 286, 294, 816 P.2d 390 (1991) (medical negligence). " 'Proximate cause of an injury is that cause which "in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." ' " *Id.* at 295, 816 P.2d 390 (citations omitted). Moreover, although "[f]oreseeability is an element of proximate cause, [i]t is not necessary that a defendant should have been able to anticipate the precise injury." *Aguirre v. Adams,* 15 Kan.App.2d 470, 472, 809 P.2d 8 (1991) (citation omitted). *See also Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 695, 339 P.2d 702 (1959). A negligent act may be considered a proximate cause of the injury " 'if by the exercise of reasonable care it might have been foreseen or anticipated that some injury might result.' " *Swearngin v. Sears Roebuck & Co.,* 376 F.2d 637, 642 (10th Cir.1967) (quoting *Atherton v. Goodwin,* 163 Kan. 22, 180 P.2d 296 (1947)). Thus, "one who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof...." *Rowell v. City of Wichita,* 162 Kan. 294, 303, 176 P.2d 590, 596–97 (1947). *See also Crow v. Colson,* 123 Kan. 702, 704, 256 P. 971 (1927) ("Where defendant knows or has reasonable means of knowing that consequences not usually resulting from the act are likely to intervene so as to occasion damage, he is liable although it be not an ordinary and natural consequence of the negligence.").

These fundamental principles were recognized and applied in *Bick v. Peat Marwick & Main,* 14 Kan.App.2d 699, 799 P.2d 94, *review denied,* 247 Kan. 703 (1990), an accountant malpractice action in which plaintiff sued his tax preparers for tax penalties assessed against plaintiff. Plaintiff alleged that the tax preparers had negligently omitted information from the tax return, thus resulting in penalties. The court held that any negligence on the part of plaintiff for failing to review the tax return was reasonably foreseeable to the tax preparers. Thus, the jury could properly find that the defendant's negligent omissions were the proximate cause of plaintiff's injuries. 14 Kan.App.2d at 710–11, 799 P.2d 94.

As to proximate cause, therefore, the issue is not whether the Accountants expressed a negligently-formed opinion as to the soundness of specific loans purchased by RCSA. And it is certainly not a question of whether the Accountants "caused" the loans to sustain losses (which would effectively grant auditors absolute immunity against malpractice actions). Rather, the inquiry is whether it was reasonably foreseeable to the Accountants that the lending and/or loan servicing practices of RCSA, if unchecked, could be expected to

result in loan losses of the type sustained by RCSA.

 The FDIC alleges that by failing to warn RCSA's Board of the probable loss on Halle loans *already* in existence at the time of the 1984 audit, the Accountants allowed a dangerous condition to continue unheeded by the Board. This dangerous condition is alleged to have directly led the Board to purchase those Halle loans for which the FDIC now claims losses, and which would not have been purchased but for the Accountants' failure to alert the Board of the unsoundness of the continued lending relationship with Halle. The court finds this evidence sufficient to create an issue of fact for the jury regarding the Accountants' proximate contribution to plaintiff's claimed losses.

The Accountants also argue that a failure to alert the Board of problems with existing Halle loans—which were reviewed in the 1984 audit—says nothing about the soundness of future loans that the Accountants had never seen. As the court construes the FDIC's theory, however, loans purchased from Halle were unsound *generally*, and a properly prepared audit would have brought this home to the RCSA Board. Although the Accountants dispute this point, the court finds sufficient evidence to require the Accountants to present their arguments to the jury.[3]

Finally, the Accountants contend that the proper measure of damages should be the difference between the value of the loans at the time they were purchased and the estimated amount that could be recovered as of December 15, 1988. This is the measure of damages associated with "loss causation," and as already noted, this rule is derived from fraud cases. *See supra*, at 1177. The Accountants recognize this, but argue that such a measurement forms the *ceiling* for damages in every action, for any cause of action, involving frustrated investment expectations.

The Accountants cite only one case that even remotely supports their argument. In *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–84 (7th Cir.1990), the court stated that " 'loss causation' *is* the standard common law fraud rule," and that loss causation is merely "an instance of the common law's universal requirement that the tort plaintiff prove causation." (emphasis in original). In *Bastian*, plaintiffs argued that they would not have invested in certain oil and gas partnerships "but for" defendants' misrepresentations concerning their competency and integrity as businessmen. Nonetheless, the court found no proximate cause between these misrepresentations and the fortuitous loss on plaintiff's investments—which might just as easily have been due to market conditions.

*Bastian* stands for the unremarkable proposition that actions sounding in fraud are governed by the same rules of causation that apply to any other tort action. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 110, at 767 (5th ed. 1984) ("courts have restricted recovery to those losses which might be expected to follow from the fraud and from events that are reasonably foreseeable"). It does *not* hold that every action based upon frustrated investment expectations is limited by the actual value of the investment at the time of plaintiff's purchase. Indeed, *Bastian* itself recognized that "loss causation" is not necessarily an element in every fraud action. In *Bastian*, the court noted that the result of that case might have been altered if plaintiffs had produced evidence that most oil and gas ventures had succeeded during the relevant time. Such evidence would allow the inference that plaintiffs' investment would have succeeded had defendants been—as represented—competent and honest businessmen. 892 F.2d at 684. Given this scenario, there would be a sufficient causal relationship between the representation (competency and integrity) and the cause for the

---

**3.** The Accountants would have a better argument if the loans for which the FDIC seeks recovery were purchased from someone other than Halle. Unless loss on *any* loan could rea- sonably have been foreseen from the very act of making *any* additional loans, subsequent losses on non-Halle loans would not be a reasonably foreseeable occurrence.

demise of the business (lack of competency and integrity).

*Bastian* sheds light on the reason why "loss causation" is so often an element of the proximate cause inquiry in cases of fraudulent representation. It is normally assumed that a defendant who sells property by making misrepresentations only has knowledge of the value of the property at the time of the sale, but has no knowledge of other conditions that might cause a future decrease in the value of that property. If such is the case, and if the value of the property happens to decline below that existing at the time of the sale, it does not automatically follow that a defendant caused a plaintiff any additional loss beyond " 'the difference between the actual value of the property at the time of the sale and the value it would have had if the representations had been true.' " *K–B Trucking Co.*, 763 F.2d at 1159.

But if the defendant has knowledge of circumstances affecting the future decrease in the value of property, or if the defendant gives assurances as to such future value when he has no factual basis for doing so, there is an obvious causal relationship between the representation and the loss that has resulted from the additional decline in the value of the property. It is not necessary for the defendant to have "caused" the additional decline. It is sufficient if the defendant either had knowledge of the potential for such a decline and failed to disclose this knowledge to the plaintiff, or if the defendant's negligent acts or omissions led plaintiff to believe that no such risk existed.

In this case, of course, defendants made no representations to RCSA concerning the soundness of the 19 individual Halle loans. In the court's view, however, this consideration is merely a matter of argument that the Accountants must present to the jury. The crux of the FDIC's case is that the negligence of the Accountants led the RCSA Board to believe that the business relationship with Halle presented no significant risk, and indeed was a profitable relationship. In *Bastian*, the court recognized that such misrepresentations or omissions may be sufficient to establish proximate causation:

> Suppose a broker gives false assurances to his customer that an investment is risk-free. In fact it is risky, the risk materializes, the investment is lost. Here there can be no presumption that but for the misrepresentation the customer would have made an equally risky investment. On the contrary, the fact that the broker assured the customer that the investment was free of risk suggests that the customer was looking for a safe investment. Liability in such a case is therefore consistent with nonliability in a case such as the present.

892 F.2d at 685–86 (citing *Bruschi v. Brown*, 876 F.2d 1526, 1527 (11th Cir. 1989)). The court can agree with the Accountants insofar as the court believes that the FDIC's causation case would be more compelling if the Accountants had made *affirmative* statements concerning the risk-free nature of the Halle–RCSA lending relationship. But this only goes to the weight of the FDIC's causation case, not its legal soundness.

Accordingly, the court finds that the FDIC has stated a viable theory of causation under its negligence case against the Accountants. Considering the evidentiary material presented, a jury could properly find that Fox, which prepared the 1984 audit, had a duty to find and disclose to RCSA that previous Halle loans had compromised the financial integrity of RCSA; that the failure to do so caused the RCSA to purchase additional loans from a source that had proven unreliable; and that RCSA would not have purchased such loans if it had been properly informed of the poor performance of those loans already on the books of RCSA. Furthermore, Fox's omissions might reasonably have been expected to lead the RCSA Board to believe that Halle loans did not pose significant risks. Thus, the nature of the omission (failure to disclose the deleterious effect of prior risky loans) bears a sufficient causal relationship to the ultimate injury (losses from similar risky loans purchased from the same source as the previous loans) to support a finding of proximate cause.

The court also finds sufficient evidence to allow the jury to consider the FDIC's claims against Grant for its 1985 audit—although Grant's ultimate liability may depend on the extent to which it was required to review, and did review, the 1984 audit by Fox and to incorporate that review in the 1985 audit.

### III. *Motion to Exclude Evidence of Prejudgment Interest*

The Accountants move in limine to exclude all reference to prejudgment interest on the grounds that such interest is not recoverable by the FDIC in this action.

■ The common law generally does not provide for awards of prejudgment interest, and in the absence of clear congressional intent to the contrary, federal courts may not award prejudgment interest in actions brought under federal law. *See Wilson v. Burlington N. R.R. Co.*, 803 F.2d 563 (10th Cir.) (no prejudgment interest authorized under FELA), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1986).

■ The FDIC alleges that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") requires prejudgment interest in this case. The FDIC relies on 12 U.S.C. § 1821($l$), which provides in relevant part:

> In any proceeding related to any claim against an insured depository institution's ... accountant, ... recoverable damages determined to result from the improvident or otherwise improper use or investment of any insured depository in-

stitution's assets shall include principal losses *and appropriate interest*.

(emphasis added). The FDIC contends that "appropriate interest" must include prejudgment interest.[4]

■ The court finds that the congressional mandate to award "appropriate interest" as a part of the FDIC's "recoverable damages" is sufficient to allow, in appropriate cases, prejudgment interest. The court's conclusion is enhanced by the observation that Congress has already specifically provided for awards of *post*-judgment interest to all successful plaintiffs in civil cases. 28 U.S.C. § 1961(a). Thus, § 1821($l$) would be rendered superfluous if the court were to interpret it to allow only post-judgment interest. As the FDIC notes, courts should avoid interpretations of statutes that renders words or phrases redundant or superfluous. *See, e.g., Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office or Workers' Compensation Programs*, 927 F.2d 1150, 1153 (10th Cir. 1991).

■ Notwithstanding the *authority* to award prejudgment interest under FIRREA, the court will reserve its decision on the appropriateness of such an award. *See Home Savings Bank, F.S.B. v. Gillam*, 952 F.2d 1152, 1161 (9th Cir.1991) ("The award of prejudgment interest in a case arising under federal law rests within the sound discretion of the court."). Moreover, the court knows of no reason why the jury, rather than the court, should consider any evidence the FDIC may wish to present

---

4. The Accountants argue that § 1821($l$) cannot be applied retroactively to this case. In this circuit, substantive federal law, as opposed to procedural and jurisdictional law, does not apply retroactively unless a contrary legislative intent appears. *Arnold v. Maynard*, 942 F.2d 761, 762 n. 2 (10th Cir.1991). Thus, the retroactivity of § 1821($l$) turns on whether it is to be considered substantive or procedural.

The FDIC cites to *Yohannon v. Keene Corp.*, 924 F.2d 1255 (3d Cir.1991) for the proposition that an award of prejudgment interest is a procedural issue. *Yohannon* itself recognized, however, that classification of a statute as "procedural" or "substantive" depends upon the context in which the question arises. Thus, although *Yohannon* held that the state prejudg-

ment interest statute in that case was procedural for choice-of-law purposes, the same statute would be substantive for purposes of the *Erie* doctrine. *Id.* at 1265. *See also Sun Oil Co. v. Wortman*, 486 U.S. 717, 726–27, 108 S.Ct. 2117, 2124, 100 L.Ed.2d 743 (1988).

The parties have not addressed this issue adequately, and the court finds that further briefing is necessary. The Accountants shall have 20 days from the date of this order to address whether § 1821($l$) should be considered substantive or procedural for purposes of this litigation. The FDIC shall have 10 days to respond. No reply brief shall be filed without prior leave of the court, for good cause shown. Each brief shall be limited to 10 pages.

with respect to prejudgment interest—nor has the FDIC offered any authority on this point. At least in this circuit, an award of prejudgment interest allowed under federal law is addressed to the equitable discretion of the trial court. *See U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256–57 (10th Cir.1988). This discretion is governed by a two-step analysis:

> First, the trial court must determine whether an award of prejudgment interest would serve to compensate the injured party. Second, when an award would serve a compensatory function, the court must still determine whether the equities would preclude the award of prejudgment interest.

*Id.* at 1257. *But see Cordero v. De Jesus–Mendez*, 922 F.2d 11, 13 (1st Cir.1990) (prejudgment interest in a federal question case is province of the jury); *United States v. Peralta*, 741 F.Supp. 1197, 1198 (D.Md. 1990) (same).

Accordingly, the jury will not be permitted to hear any evidence relating solely to prejudgment interest. The court will also specifically instruct the jury not to consider interest in calculating its damage award, if any. *See Touche*, 854 F.2d at 1257. The court will admit such evidence as bench exhibits, however, to inform the court in its decision as to the appropriateness and amount of prejudgment interest. The motion to exclude will therefore be granted, but only to the extent expressed herein.

## IV. *Objections to Use of Advisory Jury*

At oral argument on the motion to reconsider, the court also heard argument on the Accountants' motion to postpone trial pending the appellate disposition of *FDIC v. Regier Carr & Monroe*, No. Civ. 92–075 (E.D.Okl. filed Sept. 16, 1992). According to the Accountants, the Tenth Circuit "will very likely" decide in *Regier* the extent to which it is appropriate to impute to the FDIC the wrongful conduct of former officers and directors of savings and loans. Although the court denied the motion to

postpone trial, the court indicated that it might make use of an advisory jury to answer certain factual questions that would be presented in the absence of the federal common law rule of *O'Melveny*.

Both plaintiff and defendants [5] object to the use of an advisory jury in this manner. The court has considered plaintiff's objections, but overrules them. If, as the Accountants contend, an imminent decision from the Tenth Circuit would restore to the Accountants the state law defense of imputed contributory negligence, the need for a retrial would be obviated by simply asking the jury to resolve the disputed issues of state law. The court does not perceive that such a process will unduly lengthen the trial, alter strategies, or require voluminous additional evidence. To the contrary, the parties need only address two additional questions that are integrally related to the evidence and issues already within the scope of the case: (1) whether the wrongful acts or omissions of RCSA's officers and directors were undertaken for the benefit of the individual actors, or rather for RCSA; and (2) whether such conduct constitutes contributory negligence that bars the FDIC from recovery. The court has previously discussed the relevance of the first of these issues. *See generally* Order of Oct. 29, 1992, 810 F.Supp. at 1139–1141; *FDIC v. Clark*, 978 F.2d 1541, 1549 (10th Cir.1992). The second issue requires that the court address the form of contributory negligence applicable to this suit.

## V. *Form of Contributory Negligence for Auditor Malpractice*

■ The court has previously noted, without addressing the merits, that courts have adopted a modified form of contributory negligence in the case of auditor malpractice actions. *Comeau v. Rupp*, 762 F.Supp. 1434, 1440 n. 6 (D.Kan.1991). Under this modified form, "the contributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and

---

5. Defendants' objection is found in a "letter brief" that is not part of the record and that

contains no grounds in support of the objection.

to report the truth." *Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300, 307 (1984). The Accountants urge the court either to reject this modified form of contributory negligence, or to find it inapplicable in this case.

■ The modified form of the contributory negligence defense to claims of auditor malpractice originates from the case of *National Surety Corp. v. Lybrand,* 9 N.Y.S.2d 554, 256 A.D. 226 (1939). In *National Surety,* the client sued auditors for failing to detect a fraudulent check-kiting scheme perpetrated by one of the client's employees. The auditors argued that contributory negligence barred the action because the client had negligently conducted his business in a manner that made the fraud possible. The court rejected this argument:

> We are ... not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently. The situation in this respect is not unlike that of a workman injured by a dangerous condition which he has been employed to rectify. Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases. *Negligence of the employer is a defense only when it has contributed to the accountant's failure*

> *to perform his contract and to report the truth.*

9 N.Y.S.2d at 563 (emphasis added; citations omitted).

The Accountants raise only one argument to defeat application of the *National Surety* rule in this case. According to the Accountants, this court is precluded from adopting the *National Surety* rule because the Kansas Supreme Court never recognized any modified form of contributory negligence prior to the statutory abolition of the defense.[6] In essence, the Accountants contend that a federal court has no authority to address a case of "last impression" on issues of state law—presumably because the federal court's forecast can never be tested by the highest court of the state.

The court disagrees. This court has the duty to interpret and, if necessary, predict Kansas law through recourse to all legal sources—including the general rule on the issue. *See, e.g., Menne v. Celotex Corp.,* 861 F.2d 1453, 1464 n. 15 (10th Cir.1989). Nor is this mandate changed merely by indulging in the assumption that the Kansas Supreme Court is unlikely to address this issue.[7] *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 381–82, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1986) (although state courts will never have occasion to consider whether a state judgment bars a later action that can be brought only in federal court, federal courts must interpret state law on this issue).

**6.** The Accountants state that the *National Surety* rule is incompatible with the current Kansas comparative fault system, and that Kansas would therefore not recognize it if presented with this question now. (Reply, Doc. 917, at 37–39); *see Halla Nursery v. Baumann–Furrie & Co.,* 454 N.W.2d 905, 908–09 (Minn.1990); *Devco Premium Finance Co. v. North River Ins. Co.,* 450 So.2d 1216 (Fla.Ct.App.1984), *review denied,* 458 So.2d 272 (1984). The statement, while arguably correct, is entirely irrelevant to the law applicable to this case. *Cf. Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1397–99 (10th Cir. 1990) (neither contributory nor comparative negligence is a defense to Utah accountant malpractice claims unless client negligence contributed to accountant's failure to report the truth). Although Kansas now has a comparative fault system, this case is governed by tort principles

as they existed prior to enactment of the Kansas comparative fault statute—which includes the defense of contributory negligence. *Comeau,* 762 F.Supp. at 1438.

**7.** Such an assumption is by no means well-founded. Although the *National Surety* rule developed in the context of contributory negligence, the force of its reasoning has also persuaded courts to apply it in cases governed by comparative negligence principles. *See Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1397–99 (10th Cir.1990) (predicting Utah law). Thus, the court has no reason to believe that the Kansas Supreme Court will never have the opportunity to join the weight of authority by adopting the *National Surety* rule.

The *National Surety* rule enjoys general acceptance. *See Fullmer v. Wohlfeiler & Beck*, 905 F.2d 1394, 1396–99 (10th Cir. 1990) (Utah law); *Lincoln Grain, Inc. v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300, 307 (1984); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 190 (Tex.Ct.App.1987); *Jewelcor Jewelers & Distribs. v. Corr*, 373 Pa.Super. 536, 551–52, 542 A.2d 72, 79–80 (1988), *appeal denied*, 524 Pa. 608, 569 A.2d 1367 (1989); *see generally* Menzel, *The Defense of Contributory Negligence in Accountant's Malpractice Actions*, 13 Seton Hall L.Rev. 292, 293–304 (1983); Hawkins, *Professional Negligence Liability of Public Accountants*, 12 Vand.L.Rev. 797, 809–12 (1959); *but see Craig v. Anyon*, 212 A.D. 55, 208 N.Y.S. 259 (1925), *aff'd mem.*, 242 N.Y. 569, 152 N.E. 431 (1926); Note, *The Peculiar Treatment of Contributory Negligence in Accountants' Liability Cases*, 65 N.Y.U. L.Rev. 329 (1990). The weight of authority recognizes that accountants typically assume a duty to detect fraud or other irregularities, including those irregularities that are the result of, or at least made possible by, the client's negligent conduct. In effect, the accountant assumes a duty toward the client to protect the client from certain of the client's own negligent actions. Given these duties, it would be curious indeed if the accountant were then allowed to interpose as a defense the very injurious negligence of the client that the accountant has assumed a duty to discover and correct.

The Accountants attempt to distinguish the cases recognizing the *National Surety* rule by arguing that those cases involved matters within an accountant's expertise, and thus, properly entrusted to an accountant. According to the Accountants, they assumed no duty to protect their client from imprudent lending practices.

■ Be that as it may, the court thinks it likely that the evidence will show that Accountants either had or assumed a duty to inform their client of the impaired financial state of RCSA. And if the Accountants had or assumed such a duty, it would make little difference how this state of affairs came about—whether through unsound lending practices, economic conditions, or, for that matter, an Act of God. Although accountants do not act as "insurers" against any of these occurrences, the court doubts that accountants may ignore or fail to report to the client an occurrence that has impaired the financial integrity of the association.

The Accountants also imply that their duty to the RCSA was merely to render an "arithmetical bookkeeping computation." *National Surety*, 9 N.Y.S.2d at 561. The court believes it is far more likely that when an audit of a savings and loan association is performed, "[n]ot only must [the accountant] examine the books but, if that be his contract, he must satisfy himself with reasonable diligence that the books 'show the true financial position of the [association].'" *National Surety*, 9 N.Y.S.2d at 562 (quoting *In re London & General Bank*, L.R. [1895] 2 Ch. 673, 682). *See also* AICPA Professional Auditing Standards, Codification of Statements on Auditing Statements, AU § 333.02 (CCH 1986) ("[R]epresentations from management are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for his opinion on the financial statements.").

In any event, the court is in no position at this time to define precisely what duties the Accountants in this case assumed, nor how they may have failed in fulfilling these duties. Presumably, the parties are prepared to present expert testimony concerning the nature of the Accountants' professional and contractual duties and the extent to which the conduct of the Accountants did or did not conform to the standards of care imposed upon their profession.

■ The Accountants also argue that, as a matter of law, plaintiff was contributorily negligent even under the *National Surety* standard because of RCSA's "interference" with the audits. The Accountants rely on the depositions of plaintiffs' own accounting experts, who opine that the Accountants' job was made "more difficult"

**1184** 

by the bookkeeping practices of RCSA. The Accountants further contend that the *National Surety* form of contributory negligence bars the claim of a plaintiff whose negligence merely *increases* the likelihood of auditor error.

The court rejects this restrictive reading of *National Surety*, for it would effectively eviscerate the rule. The court can safely assume that deficient bookkeeping practices by the client will always make the accountant's job "more difficult" and in that sense will increase the likelihood of auditor error. Under the Accountants' formulation, recovery would be allowed only to the client who diligently maintains exemplary books and obligingly documents his mis- or malfeasance for the convenient review of his auditor, thereby eliminating any auditor duty to look beyond the representations of the client. In the court's view, contributory negligence of a type envisioned by *National Surety* is client negligence that contributes to the auditor's failure to report the truth because it is negligence outside of that which is reasonably foreseeable by auditors.

 Given the standards, the court finds that genuine issues of material fact preclude a finding of contributory negligence as a matter of law.

The court will use an advisory jury to address the two issues of state law set forth above, and the parties should be prepared to present their cases accordingly.

## VI. *Conclusion*

Accordingly, the court denies the motions of Grant Thornton and Fox & Company for reconsideration; denies the motion to exclude evidence of damages (Doc. 1012); and grants, in part, the motion to exclude evidence of prejudgment interest. (Doc. 1010).

The court shall defer ruling on the remaining pending motions until the status conference scheduled for January 4, 1993.

IT IS SO ORDERED.